

**ORDERED in the Southern District of Florida on April 1, 2016.**

*[signature]*

John K. Olson, Judge
United States Bankruptcy Court

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## FORT LAUDERDALE DIVISION
### www.flsb.uscourts.gov

| | |
|---|---|
| In re:<br>TOUSA, INC., *ET AL*.,<br><br>　　　　　Debtors.<br><br>3V CAPITAL MASTER FUND, LTD., *ET AL*.,<br><br>　　　　　Appellants,<br><br>vs.<br><br>OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF TOUSA, INC., *ET AL.*,<br><br>　　　　　Appellees. | Chapter 11 Cases<br><br>Case No. 08-10928-JKO<br><br>Jointly Administered<br><br>**Adv. Pro. No. 08-1435-JKO**<br><br>On Remand from the United States District Court<br>**Case No. 10-cv-62035-KMM** |

### REPORT AND RECOMMENDATION

This case is before the Court on reference from the United States District Court for

the Southern District of Florida pursuant to Order (the "Order of Reference") entered by the

District Court on June 23, 2015. In the Order of Reference, Chief Judge K. Michael Moore referred these proceedings to this Court "for a Report and Recommendation regarding the impact of the interim settlements on the remedies ordered by the bankruptcy court." (Order of Reference at 21).

## Jurisdiction

This Court has jurisdiction over these proceedings pursuant to 28 U.S.C. §§ 1334(b) and 157(a) and the Order of Reference.

## Background

On January 29, 2008, TOUSA, Inc. ("TOUSA Parent"), and certain of its subsidiaries filed for relief under Chapter 11 in this Court. On May 28, 2008, this Court authorized the Official Committee of Unsecured Creditors of TOUSA (the "Committee") to prosecute an adversary proceeding on behalf of certain of those subsidiaries (the "Conveying Subsidiaries") against the First Term Lien Lenders (the "First Lien Lenders"), the Second Term Lien Lenders (the "Second Lien Lenders," and together with the First Lien Lenders, the "New Lenders"), and the Senior Transeastern Lenders (the "Transeastern Lenders"). This Court also authorized the Committee to prosecute an adversary proceeding on behalf of TOUSA Parent against the New Lenders. TOUSA Parent and the Conveying Subsidiaries had engaged in a set of complex inter-related transactions with the New Lenders and the Transeastern Lenders which were consummated on July 31, 2007 (the "July 31

Transaction").[1]  The July 31 Transaction included the borrowing by TOUSA Parent and the Conveying Subsidiaries of some $500 million from the New Lenders, the granting of liens on all of the Conveying Subsidiaries' assets (which were previously unencumbered) to secure such new loans, and the payment of some $421 million to the Transeastern Lenders in settlement of obligations owed by TOUSA Parent as to which the Conveying Subsidiaries had no liability or obligation.

The Committee filed a complaint on July 14, 2008, alleging that the Conveying Subsidiaries had transferred liens and incurred obligations to the New Lenders which were avoidable under bankruptcy and state fraudulent transfer laws, and that the Transeastern Lenders were entities for whose benefit those transfers were made within the meaning of 11 U.S.C. § 550(a).  *Official Comm. of Unsecured Creditors of TOUSA, Inc. v. Citicorp N. Am., Inc., et al.*, Adv. Pro. No. 08-1435-JKO.

After a 13-day trial in the summer of 2009, this Court issued findings of fact and conclusions of law in favor of the Committee on its claims.  *Official Comm. of Unsecured Creditors of TOUSA, Inc. v. Citicorp N. Am., Inc., et al.*, 422 B.R. at 886-87 (Bankr. S.D. Fla. 2009).  The Court found that the Conveying Subsidiaries were unable to pay their debts as they came due, had unreasonably small capital following the July 31 Transaction, and

---

[1] As noted in the Order of Reference, the complex facts of the July 31 Transaction are detailed at considerable length in three reported decisions.  *See Official Comm. Of Unsecured Creditors of TOUSA, Inc. v. Citicorp N. Am., Inc., (In re TOUSA, Inc.)*, 422 B.R. 783 (Bankr. S.D. Fla. 2009); *3V Capital Master Fund Ltd. v. Official Comm. of Unsecured Creditors of TOUSA, Inc.*, 444 B.R. 613 (S.D. Fla. 2011); *Senior Transeastern Lenders v. Official Comm. Of Unsecured Creditors of TOUSA, Inc. (In re TOUSA, Inc.)*, 680 F.3d 1298 (11th Cir. 2012).

were insolvent both before and after the July 31 Transaction. The Court further found that the Conveying Subsidiaries received less than a reasonably equivalent value in exchange for the liens and obligations which they incurred in the July 31 Transaction. Finally, the Court found that the Transeastern Lenders were the entities for whose benefit the transfers were made.

## Remedies imposed by the Bankruptcy Court

The Court attempted to fashion remedies which would, to the extent possible, "provide a practicable and equitable remedy" which would "require each set of Defendants to relinquish some of the benefits obtained from the unlawful transfer so that the Defendants, collectively, will share the obligation of restoring the Conveying Subsidiaries to their pre-transfer financial position." 422 B.R. at 884. In so doing, the Court recognized that a complete recovery from one set of defendants (the New Lenders, on one hand, or the Transeastern Lenders, on the other) would mean that one set of defendants would retain the benefits of the fraudulent transfers, thereby receiving "a windfall." *Id.* The Court also recognized and provided in its remedies that for the unwinding of the fraudulent transfers to be complete, the Conveying Subsidiaries would have to be made whole for the costs they incurred "as a direct result" of the July 31 Transaction, including fees incurred to consummate the July 31 Transaction, legal expenses incurred to avoid the July 31 Transaction (which had been paid out of the bankruptcy estates) (collectively, the "Reimbursement Amounts"), and the decline in the value of the liens while they were held by the New Lenders. *Id.* at 881.

4

The remedies accordingly provided for:

(a) cancellation of the New Lenders' claims against and liens on the assets of the Conveying Subsidiaries;

(b) return by the New Lenders to the Conveying Subsidiaries of amounts that the New Lenders had been paid on account of the avoided obligations;

(c) disgorgement by the Transeastern Lenders of the funds which they had been paid under the July 31 Transaction, together with interest;

(d) restoration to the Transeastern Lenders of the claims against TOUSA Parent[2] which had been released in the July 31 Transaction; and

(e) disgorgement by the Transeastern Lenders of approximately $505 million, including prejudgment interest,[3] to be paid to the Conveying Subsidiaries which, after retention of the Reimbursement Amounts, would pay the balance of the disgorgement to the New Lenders.

---

[2] and those against TOUSA Homes LP, a TOUSA subsidiary which was not a Conveying Subsidiary but which had, with TOUSA Parent, been obligated on debt owed to the Transeastern Lenders prior to the July 31 Transaction.

[3] The Court found that the value of the assets conveyed by the Conveying Subsidiaries was $403 million, and this was the principal amount ordered to be disgorged by the Transeastern Lenders, *Id.* at 884, together with interest at the applicable New York prejudgment interest rate of 9% from July 31, 2007, through the entry of Final Judgment in the Bankruptcy Court. Post-judgment interest continues to accrue, albeit at the federal judgment rate, which is significantly lower than the applicable prejudgment interest rate. *Id.* at 885. Prejudgment interest was an appropriate part of the remedy to compensate the Conveying Subsidiaries "for the use of funds that were rightfully [theirs]." *IBT International, Inc. v. Northern (In re International Administrative Services, Inc.)*, 408 F.3d 689, 710 (11th Cir. 2005).

**Subsequent history**

The Transeastern Lenders appealed to the District Court, which reversed and quashed by Order entered February 11, 2011. In that Order, District Judge Alan S. Gold determined that the July 31 Transaction was not a fraudulent transfer because the Conveying Subsidiaries had received reasonably equivalent value in exchange for granting liens to the New Lenders, and additionally found that the Transeastern Lenders were not entities "for whose benefit" the transfers were made within the meaning of 11 U.S.C. § 550(a). *In re TOUSA, Inc.*, 444 B.R. 613 (S.D. Fla. 2011). Because Judge Gold reversed this Court's determinations that the July 31 Transaction was a fraudulent transfer and that the Transeastern Lenders were entities liable under § 550(a), the District Court did not reach the question of remedies.

The Committee appealed the District Court's Order to the Eleventh Circuit. By Order entered May 15, 2012, the Court of Appeals reversed the District Court, affirmed this Court's liability determinations, and remanded the case to the District Court. *Senior Transeastern Lenders v. Official Comm. of Unsecured Creditors of TOUSA, Inc. (In re TOUSA, Inc.)*, 680 F.3d 1298 (11th Cir. 2012). In its conclusion, the Eleventh Circuit ordered that "[t]he district court, on remand, should review, in the first instance, the remedies ordered by the bankruptcy court. We express no opinion on that subject." *Id.* at 1315.

Following extensive briefing and argument on jurisdictional issues not relevant to this Court's consideration of the questions presented in the Order of Reference, the District Court has directed this Court to provide "a Report and Recommendation regarding the impact" of

post-judgment settlements entered into between the New Lenders and the TOUSA Debtors[4] "on the remedies ordered by the bankruptcy court." Order of Reference at 21.

## Propriety of remedies

"Bankruptcy courts have consistently held that 11 U.S.C. § 550 'is designed to restore the estate to the financial condition that would have existed had the transfer never occurred'" and that the bankruptcy courts have broad equitable powers to accomplish that end. *Bakst v. Wetzel (In re Kingsley)*, 518 F.3d 874, 877 (11th Cir. 2008) (quoting *In re Sawran*, 359 B.R. 348, 354 (Bankr. S.D. Fla. 2007)); *Feltman v. Warmus (In re Am. Way Serv. Corp.)*, 229 B.R. 496, 530-31 (Bankr. S.D. Fla. 1999) (purpose of § 550 is "to restore the estate to the financial condition it would have enjoyed if the transfer had not occurred."). As part of that restoration to *status quo ante*, § 550 "provides the basis for an award of attorneys' fees and costs" to the trustee for avoiding a fraudulent transfer. *Shimer v. Fugazy (In re Fugazy Express, Inc.)*, 159 B.R. 432, 437 (Bankr. S.D. N.Y. 1993).

The Transeastern Lenders do not challenge the amounts calculated to be disgorged by them of $505 million, or the Reimbursement Amounts of $157 million. Accordingly, there is no reason to revisit those calculations or for them to be disturbed.

---

[4]J. Beck & Associates, Inc., is Liquidation Trustee for the TOUSA Liquidation Trust pursuant to the confirmed Chapter 11 Plan of TOUSA Parent and its subsidiaries, and is successor to the Committee in this Adversary Proceeding. There is no dispute among the parties as to the Liquidation Trustee's standing. For purposes of clarity, the Liquidation Trustee will be referred to in this Report and Recommendation as the "Committee."

7

**The New Lenders settlements**

The settlement among the First Lien Lenders, the Second Lien Lenders, the Debtors and the Committee is embodied in the confirmed Chapter 11 Plan (the "Chapter 11 Plan"), which became effective on August 21, 2013, pursuant to the Confirmation Order [ECF 9441]. All of the objections by the New Lenders to the remedies ordered by this Court have been withdrawn and are now moot.

The New Lenders settlement with the Committee *et al.* does not affect in any way the challenge by the Transeastern Lenders to the Reimbursement Amounts. As set forth above, the Transeastern Lenders were ordered to disgorge $505 million to the Conveying Subsidiaries. From that amount, the Conveying Subsidiaries were to retain $157 million, representing the costs incurred by them as a direct result of the July 31 Transaction.

The Transeastern Lenders contend that in settling with the New Lenders, the Committee has elected a remedy which exonerates the Transeastern Lenders from having to disgorge any amount. The Transeastern Lenders' theory is that by virtue of the avoidance of the New Lenders' liens pursuant to the Chapter 11 Plan, the Committee has elected its remedy, thereby excusing the Transeastern Lenders from any disgorgement liability, by virtue of 11 U.S.C. § 550(d).

Section 550(d) limits a trustee who has avoided a transfer under, *inter alia*, § 548, to a single satisfaction. This provision is necessary because a trustee may recover an avoided transfer from the initial transferee (here, the New Lenders) or the party for whose benefit the transfer was made (the Transeastern Lenders), or from a subsequent transferee. The

Transeastern Lenders note that "the default rule is the return of the property itself, whereas a monetary recovery is a more unusual remedy to be used only in the court's discretion," quoting *Rodriguez v. Drive Fin. Servs., L.P. (In re Trout)*, 609 F.3d 1106, 1113 (10th Cir. 2010). The Transeastern Lenders correctly contend that both avoiding a lien and recovering its value would be a double recovery, in the ordinary case.

But this is no ordinary case. This Court previously determined that "[i]n the specific circumstances of this case involving inter-related multiparty transactions, unwinding the July 31 Transaction, to the extent possible, would provide a practicable and equitable remedy." *TOUSA*, 422 B.R. at 884. Section 550 does not "[l]imit the bankruptcy court's choice of remedy to simply canceling the security interest;" such a view "would render the majority of § 550 meaningless surplusage in the context of a non-possessory lien." *See In re Taylor*, 599 F. 3d 880 (9th Cir. 2010). Under the express language of § 550(a), this Court could have imposed the entire remedial scheme on the Transeastern Lenders, including not only the $505 million ordered to be disgorged but also the $157 million Reimbursement Amounts, for a total recovery against the Transeastern Lenders of $662 million.[5] This Court's intent was, and its recommendation to the District Court is, that the recovery of the fraudulent transfers by the Committee be balanced between the New Lenders, who received the liens as part of the fraudulent transfer, and the Transeastern Lenders, who received $421 million and for

---

[5] The Transeastern Lenders have asserted from the beginning of this Adversary Proceeding over seven years ago that they have no liability as the entities "for whose benefit" the fraudulent transfers were made by the Conveying Subsidiaries in the July 31 Transaction, and they continue that frivolous contention even after the Eleventh Circuit has definitively ruled to the contrary.

whose benefit the transfers were made.

To be clear: this Court ordered the disgorgement of $505 million by the Transeastern Lenders as part of a remedy for the transfer of the liens from the Conveying Subsidiaries to the New Lenders. In addition to seeking to avoid those liens under § 548, the Committee also sought at trial to set aside the fraudulent transfer to the Transeastern Lenders of the loan proceeds under § 548. Had the Committee not sought to recover the loan proceeds as a fraudulent transfer, and had instead sought only the avoidance of the liens under § 548, this Court would nonetheless have imposed the identical remedies under § 550, including the disgorgement of $505 million from the Transeastern Lenders. A full implementation of the balanced remedies ordered by this Court, *TOUSA*, 422 B.R. 783, at 881-88, would not constitute more than a "single satisfaction" of the avoided transfers within the meaning of § 550(d).

The Transeastern Lenders' argument that the Committee has elected its remedy and that it is limited to avoidance of the New Lenders' liens is completely inconsistent with the terms of the settlement between the Committee and the New Lenders as embodied in the Chapter 11 Plan confirmed by this Court. It is also inconsistent with the Stipulation of Partial Dismissal dismissing the First Lien Lenders' appeals in the District Court. In that Stipulation, the parties expressly stipulated that the dismissal of the appeal had no effect on the First Lien Lenders' rights to share in the Transeastern Lenders' disgorgement as beneficiaries of the Liquidation Trust under the Chapter 11 Plan:

The dismissal of Case No. 10-cv-60019 and Case No. 10-cv-61731 shall have

>no effect whatsoever on the First Lien Appellants' rights under the Amended Joint Plan of Liquidation of TOUSA, Inc. and its affiliated Debtors and Debtors in possession under Chapter 11 of the Bankruptcy Code (the "Plan") including but not limited to the Term Loan Lender Transeastern Recovery of the Transeastern Disgorgement as defined in the Plan (Case No. 08-10928-JKO, D.E. # 9441.

*Joint Stipulation of Partial Dismissal* ¶ 6, Case No. 10-cv-62035-KMM (S.D. Fla. Nov. 1, 2013) [ECF 56]. As to the Transeastern Lenders, that settlement had no effect on the remedies imposed by this Court, except that instead of paying the disgorged funds to the estates of the Conveying Subsidiaries, the disgorged funds will be paid to the Liquidation Trust (as assignee of the Conveying Subsidiaries' estates) and distributed pursuant to the terms of the Chapter 11 Plan. Arguments to the contrary by the Transeastern Lenders are disingenuous.

The Committee had asserted at trial that the Transeastern Lenders were liable to the Conveying Subsidiaries *both* as part of the setting aside of the lien transfers from the Conveying Subsidiaries to the New Lenders *and* independently as transferees of the loan proceeds. This Court found that the Transeastern Lenders were liable under both theories. On appeal, the Committee abandoned the "Direct Transferee Theory" of recovery from the Transeastern Lenders. The abandonment of one theory under which the Committee prevailed has no effect upon the remedies imposed by this Court: this Court would have imposed precisely the same unwinding remedy as it did, including disgorgement by the Transeastern Lenders, even if the only fraudulent transfer which the Committee had sought to set aside was that of the liens to the New Lenders.

**The Monarch Settlement**

In 2012 and 2013, certain Transeastern Lenders[6] reached a settlement (the "Monarch Settlement") with the Committee. *See* ECFs 8553, 8588; *see also* Plan Art. V.C.1. The Monarch Settlement resolved the Committee's claims against the holders of 45.93% of the total disgorgement exposure of the Transeastern Lenders, which aggregated $505 million. The remaining Transeastern Lenders remain obligated under the Court's remedial scheme for the remaining 54.07%, a total of $273,296,992.77.

The parties do not dispute these calculations. However, the Transeastern Lenders contend that the Committee's recoveries should be further limited to 54.07% of the $157 million that the Conveying Subsidiaries are entitled to receive as the Reimbursement Amounts, rather than 54.07% of the Transeastern Lenders' full $505 million disgorgement obligation. The effect of this contention would be to significantly shift the burden of the Reimbursement Amounts from the Transeastern Lenders to the New Lenders, an entirely unfair and unbalanced allocation of the unwinding remedy which the Court imposed. The disgorgement by the Transeastern Lenders is required for the benefit of both the Conveying Subsidiaries and the New Lenders. The Monarch Settlement, which resulted in payment to the Committee, thus properly has an effect on the allocation of the Reimbursement Amounts as between the Committee and the New Lenders. It should have no effect whatsoever on the

---

[6]Monarch Master Funding, Ltd. and certain affiliates (collectively, "Monarch"), JP Morgan Chase Bank, N.A., and Bear Stearns Investment Products Inc. Monarch acquired an additional amount of Transeastern Lenders' interests after the Monarch Settlement was first reached; this additional amount is included in these calculations.

Transeastern Lenders' repayment obligations, which remain $273,296,992.77 plus post-judgment interest. Similarly, it should have no effect upon the restoration of the claims which the Transeastern Lenders can assert against TOUSA Parent and TOUSA Homes LP which were released in the July 31 Transaction.

### The D&O Settlement

Three disputes were brought in this Court against former officers and directors; all were ultimately settled. In Adversary Proceeding No. 09-1616 (the "Fiduciary Duty Action"), the Committee sued Technical Olympic, S.A. and certain officers and directors for breaches of fiduciary duties and related claims for failing to act in the best interests of the Conveying Subsidiaries for actions taken before and in connection with the July 31 Transaction. In Adversary Proceeding No. 09-2281 (the "D&O Coverage Action"), certain of the Debtors sought a declaration that their insurers[7] were liable for claims and defense costs associated with the Fiduciary Duty Action. Certain additional claims were asserted by letter demand upon the defendants in the Fiduciary Duty Action by Monarch and Trilogy Capital LLC and by the First Lien Term Loan Agent and the First Lien Revolver Agent (collectively, the "Prepetition Secured Lender Demand Claims").

Each of these disputes was resolved in the D&O Settlement, pursuant to which certain of the carriers paid $67 million.[8] The D&O Settlement is embodied in the Plan at Art. V.C.2.

---

[7]The insurance coverage at issue involved separate stacked coverages of $100 million each for calendar years 2006 and 2007.

[8]An additional $25,000 was paid later to settle claims against an additional carrier whose litigation exposure was categorically different from the prior-settling carriers.

13

The Plan provides for the $67 million to be distributed (a) $47,857,142.86 for the benefit of the unsecured creditors of the Conveying Subsidiaries; (b) $7,657,142.85 for the benefit of the First Lien Term Lenders and the First Lien Revolver Lenders; and (c) $11,485,714.28 for the benefit of the Second Lien Term Lenders. *See* ECF 9201 at ¶ 22.a.

The Transeastern Lenders contend that their disgorgement obligations should be reduced by the entire $67 million paid under the D&O Settlement on the theory that "[t]he injuries alleged in the Fiduciary Duty Action are the same as the Lien Transfer injuries that resulted in this Court ordering disgorgement from the Transeastern Lenders." [ECF 1220 at page 18 of 23]. They are not the same injuries, and the Transeastern Lenders are not entitled to any such reduction in their obligations to disgorge the remaining $273 million in fraudulent transfers which they owe.

**The D&O Settlement does not overlap with the Fraudulent Transfer recoveries**

First, the injuries involved are not the same. The directors and officers of the Conveying Subsidiaries manifestly breached their fiduciary duties to those entities, including in a number of decisions and actions taken prior to the July 31 Transaction. They did not consider the effect of the July 31 Transaction on the Conveying Subsidiaries to which they owed fiduciary duties but instead considered only their conflicting duties to TOUSA Parent. They refused to consider any refinancing strategy which would have diluted the equity interests of Technical Olympic, S.A., and its controlling shareholders, the Stengos family of Greece. They refused to consider any refinancing of the $1 billion in outstanding bonds on which the Conveying Subsidiaries were liable, possibly by obtaining financing for those

14

entities independent of the bailout of TOUSA Parent's debt to the Transeastern Lenders. In short, the damages for which the directors and officers were liable were both separate from and in addition to the fraudulent transfer recoveries for which the Transeastern Lenders are liable.

Fraudulent transfer and fiduciary duty litigation often proceed on parallel paths because there are separate remedies for each category of claim. *See*, *e.g.*, *Kapila v. Clark (In re Trafford Distributing Center)*, 431 B.R. 263 (Bankr. S.D. Fla. 2010); *Brandt v. Hicks, Muse & Co. (In re Healthco Int'l, Inc.)*, 208 B.R. 288 (Bankr. D. Mass. 1997). In *Trafford*, this Court awarded punitive damages against the Debtor's sole shareholder, officer, and director in an amount almost five times the amount she had caused the Debtor to fraudulently transfer because of the damage to the Debtor which her breaches of fiduciary duty had caused. Similarly, in *Healthco*, the Court found that the damages caused by the breaches of fiduciary duty there went far beyond the debt which a leveraged buyout caused the company to incur, and included the decrease in value of the company which resulted from the LBO, including long term damage: "The defendants contend the measure of damages is limited to any decrease in Healthco's value immediately after the LBO, not two years later. This is like saying of an accident which caused gradual health deterioration in the plaintiff that damages are limited to the plaintiff's state of health immediately after the accident." *Healthco*, 208 B.R. at 310.

The Committee sought damages from the directors and officers for the decrease in value of the Conveying Subsidiaries caused by the fraudulent transfer together with punitive

damages. Based upon this Court's findings in *TOUSA*, 422 B.R. 783, both of these categories of claims were extremely likely to succeed.[9] By contrast, the Transeastern Lenders had no liability for the diminution in the Conveying Subsidiaries' value[10] resulting from the directors' and officers' breaches of their fiduciary duties, nor for punitive damages, but only for disgorgement of the fraudulent transfer which they received and reimbursement of the fees and costs associated with the fraudulent transfer and the litigation over it. The parties to the D&O Settlement recognized and stipulated [ECF 9201-1 ¶ 4] that "if the Committee and the Prepetition Secured Lenders were to prevail on all of the claims asserted in the Fiduciary Duty Action and the Prepetition Secured Lender Demand Claims, the amount of damages would be $200,000,001."

### $19 million of the D&O Settlement was paid to others than the Conveying Subsidiaries

Second, of the $67 million paid in the D&O Settlement, more than $19 million went not to the Conveying Subsidiaries but to other parties who had their own separate claims

---

[9] Although the Transeastern Lenders assert [ECF 1224 at page 11 of 17, n. 8] that "[a]ny recovery by the Trustee of punitive damages in the Fiduciary Duty Action would have been very difficult at best," this Court believes otherwise. The actions and directions of TOUSA's controlling shareholders, the Stengos family, and of the directors and officers in the Spring of 2007 certainly appeared to this Court to be the kind of willful misconduct that would warrant an award of punitive damages. *See TOUSA*, 422 B.R. at 790-796. The Court vividly recalls being shocked during the 13 days of trial in 2009 by the decisions taken by the TOUSA directors and officers in the seven month run-up to the July 31 Transaction.

[10] The calculation of the diminution in value of the Conveying Subsidiaries' assets would require the Court to determine the fair market value of the Conveying Subsidiaries' assets prior to the July 31 Transaction and their value thereafter, less the recovery in the fraudulent transfer litigation, so that there would be no double recovery. As a result of the settlement of the D&O litigation, these calculations were never required to be made.

against the directors and officers [ECF 9201 ¶ 22.a]. This money never was paid to the Conveying Subsidiaries and there is no conceivable theory under which the Transeastern Lenders could be entitled to an offset for amounts paid to other parties to settle their independent claims against the directors and officers.

### No legal or equitable entitlement to any overlap

Third, even if there were some overlap between the $48 million paid to the Conveying Subsidiaries under the D&O Settlement and the fraudulent transfer recovery from the Transeastern Lenders – and this Court finds that there is not – the Transeastern Lenders' contention that they should be entitled to the entirety of any such theoretical overlap is inequitable. The remedial structure put in place by this Court attempted, and the Court believes succeeded, in balancing the respective fraudulent transfer exposures of the New Lenders (who advanced $500 million to fund the July 31 Transaction) and the Transeastern Lenders (who were paid $421 million of that amount). The Transeastern Lenders claim to the entirety of any theoretical overlap is unprincipled, entirely results-oriented, and would seriously unbalance the parties' respective burdens.

Moreover, the Transeastern Lenders' liability cannot be reduced as a result of payments the Conveying Subsidiaries received from unrelated sources and to which the Conveying Subsidiaries did not contribute. The collateral source rule prohibits the setoff of any collateral source benefits received by the Conveying Subsidiaries from the fraudulent conveyance damage award. *F.D.I.C. v. First American Title Ins. Co.*, 611 Fed.Appx. 522, 2015 WL 1906139 (11th Cir. Case No. 13-15058, Apr. 28, 2015); *Citizens Prop. Ins. Corp.*

*v. Hamilton*, 43 So.3d 746, 751 (Fla. 1st DCA 2010); *In re EBW Laser, Inc.*, 2012 WL 3490417 (Bankr. M.D. N.C. 2012).

## Waiver

The Transeastern Lenders have raised their claims to an offset against the D&O Settlement amounts for the first time in connection with this reference from the District Court. The D&O Settlement was a fundamental part of the Plan and the Transeastern Lenders knew about it at the time of Plan confirmation. There is, of course, no provision in the Plan for any offset of the sort sought here by the Transeastern Lenders, and they never argued during the confirmation process that the D&O Settlement should reduce their disgorgement obligation. They raised no objection to confirmation on that basis, and did not appeal from the confirmation Order on that basis. Their belated assertion of a right to offset has been waived.

## Conclusion

The New Lender Settlement does not affect in any way the obligation of the Transeastern Lenders to full disgorgement of the $505 million ordered to be disgorged in *TOUSA*, 422 B.R. 783 (Bankr. S.D. Fla. 2009). The Monarch Settlement reduces the liability of only those Transeastern Lenders who participated in that settlement, with the net effect of a reduction in the liability of the remaining Transeastern Lenders to $273,296,992.77. The D&O Settlement does not result in any reduction of the remaining Transeastern Lenders' disgorgement obligation.

This Court accordingly **RECOMMENDS** that the District Court adopt the foregoing conclusions.

### 

I:\ORDERS\08-1435.TOUSA.remand.R&R.wpd